H8i1hera

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  HERBALIST & ALCHEMIST, INC.,

4                  Plaintiff,

5          v.                              16 Civ. 9204 (ER)

6  ALURENT PRODUCTS, INC., et
   al.,
7
                   Defendants.            Oral Argument
8  ------------------------------x
9                                         New York, N.Y.
                                          August 18, 2017
10                                        2:30 p.m.

11 Before:

12                   HON. EDGARDO RAMOS,

13                                        District Judge

14                       APPEARANCES

15 PHILLIPS NIZER LLP
        Attorneys for Plaintiff
16 BY:  MONICA P. McCABE, ESQ.
        JANEEN R. HALL, ESQ.
17
   WEIL, GOTSHAL & MANGES LLP
18      Attorneys for Twitter, Inc.
   BY:  RANDI W. SINGER, ESQ.
19      JENNIFER RAMOS, ESQ.

20 PAUL WEISS
        Attorneys for Let's Encrypt
21 BY:  WARREN A. STRAMIELLO, ESQ.

22

23

24

25

H8i1hera

| | |
|---|---|
| 1 | (Case called) |
| 2 | THE LAW CLERK:  Counsel, please state your name for |
| 3 | the record. |
| 4 | MS. McCABE:  Monica McCabe for the plaintiff. |
| 5 | MS. HALL:  Janeen Hall for the plaintiff. |
| 6 | MR. STRAMIELLO:  Warren Stramiello on behalf of |
| 7 | nonparty Let's Encrypt. |
| 8 | MS. SINGER:  Randi Singer on behalf of nonparty |
| 9 | Twitter. |
| 10 | THE COURT:  Good afternoon to you all.  This matter is |
| 11 | on for a show cause hearing. |
| 12 | Let me begin with you, Ms. McCabe.  Tell me where we |
| 13 | are. |
| 14 | MS. McCABE:  Okay. |
| 15 | THE COURT:  You can remain seated.  Just please speak |
| 16 | directly into the microphone. |
| 17 | MS. McCABE:  Sure.  Well, we've made a lot of progress |
| 18 | in terms of resolving the issues with respect to the vast |
| 19 | majority.  I think we had 17 parties.  The defendants have not |
| 20 | responded whatsoever and continue to sell product, like this, |
| 21 | that our investigator purchased just recently.  We have settled |
| 22 | out with a number of parties, so the only ones remaining now |
| 23 | are Twitter -- iDWeeds, just hasn't responded at all. |
| 24 | THE COURT:  I what? |
| 25 | MS. McCABE:  IDWeeds. |

H8i1hera

1        THE COURT:  IDWeeds?

2        MS. McCABE:  Yes, .com.  SupplementJournal.com, AT&T.

3   Those three didn't respond at all.  And Let's Encrypt, I

4   thought we had withdrawn our claims against them, but they have

5   appeared and have sent your Honor a letter, as you probably

6   know, and we responded last night.  But at this point, you

7   know, our proposed order does not include Let's Encrypt at all.

8        THE COURT:  Okay.  And you say you thought that you

9   had withdrawn your claims against them.

10       MS. McCABE:  We submitted a letter on August 14th to

11   the Court stating all of the parties that we withdrew our

12   claims against because either they complied, we reached a

13   settlement, etc.  And this morning I should also add we reached

14   a settlement with YouTube, so YouTube is no longer in the

15   action.

16       THE COURT:  Okay.  So we have two parties here.  So

17   let's take them one at a time.

18       Mr. Stramiello, so what do you have to say?

19       MR. STRAMIELLO:  Well, I just want to make sure that

20   all claims against Let's Encrypt have been dropped.  The reason

21   that we weren't sure about that was because in the 8/14 letter

22   motion, which was filed as a letter motion for extension of

23   time, it indicated that plaintiff was withdrawing all claims

24   because they were moot, but the problem is that the order that

25   issued on it didn't reschedule it.  It didn't include any order

H8i1hera

1    to not appear, letting us know we were excused, and so out of

2    an abundance of caution, we've appeared, because we were

3    ordered to do so in the original order to show cause on

4    July 20th.  We are maintaining, though, that despite the fact

5    that they have now admitted that we should not be part of this,

6    we still want an order from this Court discharging us from it

7    so we aren't going to be dragged back here again, and we also

8    want costs, fees, and expenses, because they filed this despite

9    the fact that the websites were already mooted about two weeks

10   before they did their filing and about a month before this

11   Court signed an order to show cause.

12            THE COURT:  Ms. McCabe, any objection to my dismissing

13   them?

14            MS. McCABE:  No objection.  If I just might add one

15   thing.  Obviously we object to attorney's costs and fees.  The

16   reason why we held off on letting them out was because we were

17   still negotiating with the registrar Enom that held registered

18   domain name herbalist-alchemist.com, and up to a week or two

19   ago, we were not sure that the site was going to be permanently

20   taken down.  They sent us an email saying, we've put it on

21   administrative freeze.  Well, with this defendant, as you'll

22   see in the papers, they constantly take a site down and then it

23   pops up somewhere else.  And in fact, when we went back on the

24   site yesterday, another site that -- where Let's Encrypt issued

25   a certificate, Nfinx.com/shop, our products are still up on

H8i1hera

| | |
|---|---|
| 1 | that site.  Even though if you go to Nfinx.com, it redirects to |
| 2 | a completely different website, and I don't know how |
| 3 | technologically they've done this, but they've done this.  So |
| 4 | that's the problem and that's why we waited until we had a |
| 5 | resolution with the parties to let Let's Encrypt out.  It |
| 6 | wasn't that we wanted to hold them in to make them, you know -- |
| 7 | cost them money or anything like that. |
| 8 | THE COURT:  Okay.  So Mr. Stramiello, your client is |
| 9 | dismissed from this action. |
| 10 | And I hesitate to ask this, but in anticipation of the |
| 11 | motion that you wish to make, tell me how all this fits |
| 12 | together, Ms. McCabe, how your client and the defendant and |
| 13 | Let's Encrypt, an organization that I'm unfamiliar with prior |
| 14 | to this action, how they fit into this.  What's their role? |
| 15 | MS. McCABE:  So in order to have a secure site, domain |
| 16 | holders register with SSL certificate issuers, and Let's |
| 17 | Encrypt is one of those.  So your Honor, if you go to a website |
| 18 | and you want to plug in a website, you put in http, and then, |
| 19 | you know, colon slash slash.  That site is not secure.  But if |
| 20 | you put in https colon slash, that means the site is secured |
| 21 | and it has an SSL certificate.  And it gives the public and the |
| 22 | consuming public some comfort that the site they're on is |
| 23 | legitimate and is secure, that their credit card information |
| 24 | isn't going to be, you know, broadcast all over the internet, |
| 25 | etc. |

H8i1hera

1          So what happened was, Let's Encrypt issued SSL

2    certificates on herbalist-alchemist.com, Nfinx, and some of the

3    other sites involved in this action owned by the defendants.

4    And we sent them a letter, attaching your Honor's March 8th

5    order, asking them to revoke the certificate.  And we were

6    met -- basically they said no, and then we --

7          THE COURT:  I'm sorry.  I don't want to lose track of

8    the narrative here.  According to Mr. Stramiello, a month

9    before I issued the order, they had already I guess withdrawn

10   the certificate, although --

11         MS. McCABE:  No, they didn't withdraw the certificate.

12   There's two different ways -- we also wrote to the domain name

13   host, Enom, OVH, and they can take the site down, but what the

14   defendants were doing is, because the name itself wasn't

15   deregistered by Enom, they just go to a different host.  So

16   they started at one host and then they went to OVH, and so it

17   just kept popping up and we --

18         THE COURT:  And does the certificate that Let's

19   Encrypt gives them, does it travel with them as they go from

20   host to host?

21         MS. McCABE:  Yes, it goes with the domain name, as I

22   understand it.

23         THE COURT:  Okay.  I see Mr. Stramiello shaking his

24   head back there, but okay.  So you were concerned that despite

25   the fact that the defendant was off of one site that had the

H8i1hera

1   Let's Encrypt certificate, that it would go to another site and

2   carry the certificate with it and it pops back up.

3        MS. McCABE:  Yes.  And just to give you an example, I

4   believe on May 25th we sent Let's Encrypt a letter asking

5   them to revoke the certificate on a site.  And just a few days

6   later, they reissued the certificate.  So they obviously just

7   disregarded, you know, our request.  And the certificates only

8   last for a certain amount of time.  I think typically with

9   Let's Encrypt they last three months.  So they have to be

10  reissued.  So even if they didn't want to revoke it, they

11  decided to reissue it even after, you know, we notified them of

12  the problems with this defendant and these websites and the

13  sale of infringing products, etc.

14       THE COURT:  And those representations were made by

15  Let's Encrypt directly or through counsel?

16       MS. McCABE:  Well, originally we were dealing with

17  Let's Encrypt's businessperson.  He sent an email refusing, and

18  then he said, I could pass it on to our legal team, and then we

19  said, yes, please pass it on to your legal team.  And then the

20  legal team came back and said, no, you know, we're not

21  responsible and we're not going to revoke or not stop issuing

22  certificates.

23       THE COURT:  And this is after they received the order

24  that I issued.

25       MS. McCABE:  Yes.

H8i1hera

| | |
|---|---|
| 1 | THE COURT:  Okay.  Mr. Stramiello? |
| 2 | MR. STRAMIELLO:  Which would you like me to address |
| 3 | first, your Honor, the technological problems or the order? |
| 4 | THE COURT:  Tell me how it works.  Tell me what the |
| 5 | role of your client is and how these certificate work and |
| 6 | whether they travel from host to host. |
| 7 | MR. STRAMIELLO:  Certificates, first off, do not |
| 8 | travel from host to host, and to be clear, there are different |
| 9 | types of SSL certificates.  Let's Encrypt issues only one type |
| 10 | of those certificates, called a domain validation certificate. |
| 11 | It is not in any way stating anything about the identity of the |
| 12 | owner.  All it says is that -- all this is essentially is a |
| 13 | signature saying these people, whoever requested this |
| 14 | certificate on such-and-such a date, had control of the domain |
| 15 | name on that date.  The portion of that certificate that is |
| 16 | issued by Let's Encrypt is the signature.  Let's Encrypt signs |
| 17 | based on a submission from the host, from the domain host, by |
| 18 | domain name, wholly qualified domain name, they check for |
| 19 | control of that, and they sign off.  The part of the |
| 20 | certificate that is used to encrypt or secure the connection is |
| 21 | the public key.  The public key that is in a certificate is |
| 22 | generated by the domain that is requesting the certificate, not |
| 23 | by Let's Encrypt.  They send it to Let's Encrypt as part of |
| 24 | their request, and it's included in the signed certificate that |
| 25 | is sent back.  But that part of it that is responsible for the |

H8i1hera

1  securing, responsible for the security, is generated and

2  maintained by the defendant.  These domain validation

3  certificates are only good for a single domain name, a fully

4  qualified domain name.  So for instance,

5  www.herbalistandalchemist.com would be, for instance, an

6  example of a fully qualified domain name.

7          THE COURT:  Okay.

8          MR. STRAMIELLO:  If they go to a different domain

9  name, suddenly they put up a website, let's say GNstat.com or

10 BuyFromUs.com.  The certificate will not work if they move it

11 there because certificates only apply to that fully qualified

12 domain name.

13         THE COURT:  Can I just stop you and ask you a question

14 so I don't lose it.

15         MR. STRAMIELLO:  Of course.

16         THE COURT:  So as I understood Ms. McCabe, what was

17 happening was, I think, herbalist.com was moving from -- I'll

18 just make these up -- GoDaddy to, you know, AT&T to MS, and so

19 they weren't changing the name, the domain name, but they were

20 changing who was hosting that domain name.  So how would your

21 certificate work under those circumstances?

22         MR. STRAMIELLO:  That's where I think there might be

23 some confusion about what's actually gone on with what the

24 defendant appears to be doing.  Because there's a difference

25 between moving your domain name between registrars and moving

H8i1hera

1    the website which contains the contents to a different host and

2    moving the website which contains the contents to a different

3    domain name.  And so if they move the domain name, the domain

4    name remains the same, the certificate will remain the same.

5              MS. McCABE:  That's what I meant, your Honor.

6              MR. STRAMIELLO:  However, what's happening here is, at

7    least from what I have seen and what has been in the publicly

8    available network records, is that they are not moving their

9    domain name.  Their domain names are still under the control of

10   the primary registrars, and those are the ones who have blocked

11   them.  Instead they're taking down their contents and they're

12   moving their contents to a new domain name or to a new web host

13   that has a different domain name.  Let's Encrypt's cert will

14   not affect this because it is based on the fully qualified

15   domain name.  So if you were to move the content elsewhere,

16   doesn't matter.  It will -- the Let's Encrypt cert won't work

17   because it has to be on the domain name, because these

18   certificates have nothing to do with the content of the website

19   or the ownership of the website.  That's not what they're for.

20             THE COURT:  They're only for the domain name.

21             MR. STRAMIELLO:  They only say that you are trying to

22   connect to domain name X.  Domain name X gave you their public

23   key.  This is the same public key we saw associated with that

24   domain name at the time the certificate was signed.  That's all

25   it's doing.

H8i1hera

1        THE COURT:  And so from your perspective, when you

2    received or when your client received the communication from

3    Ms. McCabe, telling them, please remove your certificate, they

4    said no.  Is that correct?  Is that accurate?  What happened,

5    from your perspective?

6        MR. STRAMIELLO:  Okay.  What happened was that they

7    received a copy of the March 8th order which said nothing

8    about SSL certificate, nothing about a domain name or any

9    particular domain name, and simply said, the mark Herbalist &

10   Alchemist is our trademark, don't use it, all related to that

11   trademark.  The domain name that they sought to have the

12   certificate revoked for was not included anywhere in that order

13   and in fact doesn't match the exact trademark that is in that

14   order.  Let's Encrypt, which is -- their sole thing is to say

15   this public key was in control of this site at that time,

16   doesn't look towards the content of the website, doesn't

17   validate the content of the website, and doesn't check to see

18   whether anything in there may or may not be a trademark

19   infringement and can't independently make that judgment

20   regardless of the fact that trademarks, as your Honor is aware,

21   are used in context specific, and so if we receive a request to

22   take down a domain name that is not the exact same as the mark,

23   we have no way of telling whether it's coming from a valid

24   court order, whether it's actually contemplated to be in the

25   order, or whether it's done by someone who is simply trying to

H8i1hera

1    spoof and take down domain names, because we do get take-down

2    requests.

3              THE COURT:  Court orders?

4              MR. STRAMIELLO:  Yes, your Honor.

5              THE COURT:  How often does that happen?

6              MR. STRAMIELLO:  With some frequency.  It's a problem,

7    because with network infrastructure, network security, one of

8    the ways that you can try to breach into a website or breach a

9    user's connection to a website is by acting as what's called a

10   man in the middle, meaning you have user here, server here, and

11   you stand in the middle and you catch everything that's going

12   to come through towards the server, you catch everything that

13   comes from the server, and you muck about with it in some way

14   to your benefit when you send it back, so you're essentially

15   spoofing.  Ways that you can do that include putting in false

16   verification requests or otherwise trying to cause harm and

17   chaos in the system.  And so as a result, unless we have

18   something that clearly tells us what we need to take down

19   rather than us having to look at something that's, frankly,

20   rather ambiguous as to what domain names may or may not be

21   included, we need clear, strict guidance on that.

22             THE COURT:  Okay.  So what happens?  So you get a

23   request -- and I have to say this is the first time I believe

24   you've appeared before me.

25             MR. STRAMIELLO:  Yes, sir.  We weren't mentioned in

H8i1hera

1    either the original default judgment nor were we part of the

2    motion to reopen.  I think we were first mentioned in the order

3    to show cause filed on July 6th.

4              THE COURT:  Okay.  But you get a request from a firm,

5    which is Phillips Nizer, which is a firm that's been around for

6    a while, and then they purport to have a court order.  So did

7    you tell them no and go away or do you say, what we received is

8    unclear to us, what is it that you want?  What happened?

9              MR. STRAMIELLO:  They were told that it was unclear,

10   they were told that the proper way to do this is to go to the

11   registrar who holds the domain name and go through the

12   registrar, because that is the proper party to go to if you're

13   trying to do a take-down request or seize control of a domain.

14   The Let's Encrypt certificate, the domain validation

15   certificate, are not in any way part of that order because

16   Let's Encrypt is not a party to that.  If they wanted to bring

17   Let's Encrypt in as a party, they could use a variety of civil

18   procedure mechanisms.  They didn't do that.  Instead they came

19   to us and they tried to enforce against a domain name that is

20   not the same as the trademark and is not part of the order and

21   even -- and SSL certificates, revoking SSL certificates were

22   not part of that order.  If they wanted to do that, they could

23   have come to this Court and gotten a specific order for a

24   specific domain and come to us, but that's not what they did.

25             THE COURT:  Okay.  Ms. McCabe?

H8i1hera

| | |
|---|---|
| 1 | MS. McCABE:  Yes.  So I just want to refer your Honor |
| 2 | back to the March 8th order.  So the last subparagraph E |
| 3 | says, "The forfeiture to plaintiffs or cancellation of the |
| 4 | domain name herbal-alchemist."  I don't know how much clearer |
| 5 | that could be in terms of what domain name we were trying to |
| 6 | have canceled or transferred. |
| 7 | Also, if you go back to page 3 of the order, it says, |
| 8 | "In addition, defendants, their directors, principals, |
| 9 | officers, agents, representatives, service employees, |
| 10 | attorneys --" |
| 11 | THE COURT:  Slow down, please. |
| 12 | MS. McCABE:  Sorry.  "-- attorneys, successors and |
| 13 | assigns, and all others in active concert or participation with |
| 14 | defendants be permanently enjoined and restrained from."  And |
| 15 | then it lists a whole host of things having to do with the use |
| 16 | of the trademark and the products.  And so it's not necessary, |
| 17 | in this district, in this circuit, to list out every nonparty |
| 18 | in an order like this.  The key here is, were the nonparties |
| 19 | aiding and abetting the defendants in selling and promoting, |
| 20 | distributing their product.  And I think, you know, the answer |
| 21 | to that question is in a series of Southern District cases, and |
| 22 | the most recent being *Arista Records v. Vita Tkach* by Judge |
| 23 | Nathan.  Very similar facts, where a default judgment was |
| 24 | issued and basically the plaintiff was playing whack-a-mole, |
| 25 | which is what they're doing here.  You knock them down here, |

H8i1hera

1    they pop up over here.  And so because in our case, the

2    registrar was refusing to deregister the name, the defendants

3    were going from -- as Mr. Stramiello mentioned, popping from

4    host to host to host.  And they were having the verification

5    that they were legit from Let's Encrypt.  And that's why we

6    asked Let's Encrypt to please revoke their certificates.  These

7    are bad actors.  You don't want to be associated with them.

8    And, you know, if a site isn't secure, you get the notice, this

9    is not a secure site.  When they have a Let's Encrypt

10   certificate, that little notice to the public doesn't occur.

11   So they are, in my opinion -- and I believe the case law in

12   this circuit, aiding and abetting a defendant, maybe not

13   knowingly, but once they're put on notice of your Honor's

14   order, that, you know, makes it clear these are bad people and,

15   you know, and in one of the cases, it was held even if it's

16   futile -- because they said, oh, well, the domain name went

17   down so it doesn't matter about our certificate -- the judge

18   found that the futility argument doesn't matter.  The question

19   is, are you aiding the defendants in any way to sell or promote

20   infringing products.

21            MR. STRAMIELLO:  May I be heard, your Honor?

22            THE COURT:  Absolutely.

23            MR. STRAMIELLO:  I want to correct several things

24   there.  And actually I want to highlight one particular one for

25   the Court.  The Court's order, as opposing counsel just told

H8i1hera

1    you, was for I believe canceling and transferring the domain

2    name.  That's not something Let's Encrypt does.  It's not

3    something Let's Encrypt could do.  It's not something Let's

4    Encrypt has the power to do.  That is something that is within

5    the control of the domain registrar, not someone who issues an

6    SSL certificate of any form, let alone the minimal form that

7    Let's Encrypt issues.  The one there is Enom, and that's who

8    they approached and that's who their beef is with, your Honor,

9    not with us.  If they have a problem getting a transfer or the

10   domain transferred or canceled, Enom is the one they should be

11   dragging in here, not us.

12          THE COURT:  So let me ask you this.  Is it the case

13   that, again, herbalist.com with your certificate picked up and

14   moved from one host to another and because they had the same

15   domain name, your certificate stays with it, and you get this

16   order, your response is, well, this doesn't apply to me

17   because?

18          MR. STRAMIELLO:  It would have to be -- I would have

19   to see the order and I would have to see what the order is

20   instructing the parties to do so I can make a determination as

21   to whether it applies to a nonparty that issues a domain

22   validation certificate, and when you look at the cases in the

23   Southern District, with all due respect to opposing counsel,

24   that's a little bit of a stretch, what they're saying.  If you

25   look at the *Arista* case, the nonparty they were concerned with

H8i1hera

1   is a company called Cloud Player, and if you look at the

2   decision in the *Arista* case and if you look at what Cloud

3   Player actually does, they don't simply issue as a sell server.

4   They have nothing to do with that stuff at all.  They're higher

5   up the food chain.  They're a domain registrar, meaning they

6   have control over the domain name records.  They are the ones

7   in charge of that.

8          On top of them being a domain registrar for the party,

9   they also were a web host, meaning the content was hosted on

10  their servers under their control.  On top of that, not only

11  was the content hosted on their servers but they were actively

12  going through and load balancing and optimizing how people

13  could connect to that content.  And it was the combination of

14  those three factors in *Arista* that led to the holding, finding

15  that nonparty Cloud Player was aiding and abetting, and it was

16  those three active components.  Let's Encrypt doesn't do any of

17  them, and in fact, if you look at *Arista*, the court speaks

18  approvingly of the *Beckowitz* decision, which is the one all the

19  nonparties have been citing to you because that's the one that

20  says you have to do something more than just passively host.

21  You have to do something more than just what you ordinarily

22  would do.  You must become actively involved for an aiding and

23  abetting, even assuming *Arista* was correctly decided.  And none

24  of that is what Let's Encrypt does.

25          THE COURT:  I understand that.  But I guess I'm trying

H8i1hera

1    to figure out this new world.

2              MR. STRAMIELLO:  Of course.

3              THE COURT:  But Let's Encrypt gets a court order that

4    says herbalist.com is infringing the trademarks of a particular

5    company and the particular company has made a preliminary

6    showing that it would succeed on the merits, so whatever you're

7    doing to help that company, stop.  And the response is, no?

8              MR. STRAMIELLO:  Your Honor, if the order said that,

9    those exact words, the response would be, okay, and we would

10   revoke the certificate pursuant to the order.  But to get to

11   there, we need to have an order from the Court that is specific

12   and unambiguous about what steps we are supposed to be taking,

13   and that's not what we were given.

14             THE COURT:  So let me ask this.  And this question is

15   for both of you.  Why wasn't there a conversation which went as

16   follows:  Look, you've got a bad guy going after this product,

17   I've got this order, I can't do what this order says, go back

18   and get me an order that says X?  Does that conversation take

19   place?

20             MR. STRAMIELLO:  My understanding is that they were

21   informed that the order is ambiguous, we cannot act on the

22   order, we don't adjudicate trademarks so we're not going to

23   revoke it, the proper party that you should go after under this

24   order and, frankly, the one who has the control over this is

25   the domain registrar, who you should go and talk with.  And my

H8i1hera

1    understanding was that it was left open and there was no

2    further communications after that, interchange.  But I was not

3    part of those communications so I'm not fully versed on them,

4    your Honor.

5            THE COURT:  Okay.  And by the way, I'm still learning

6    about this --

7            MR. STRAMIELLO:  Of course.

8            THE COURT:  -- okay?  So you tell them, look, this is

9    ambiguous, I'm not going to withdraw the certificate, and so

10   while Ms. McCabe comes running back to me to get another order,

11   herbalist.com now goes to another host and they're still

12   following them around, and because they have your certificate,

13   they're able to do that, right?  So you say, no, no, you've got

14   to go to this host.  They go to the host, herbalist.com goes to

15   another host, and because they have your certificate, they're

16   able to do that.  So what happens?

17           MR. STRAMIELLO:  Well, let me step back, because

18   that's not actually what happened here, because it's not a

19   moving of the host.  If they move hosts, it may or may not be

20   invalidated.  What matters is the registration, the domain

21   record, and that's under the control of the domain registrar.

22   That record has to be moved, in your hypothetical, for the

23   Let's Encrypt certificate to work.  That's not what happened in

24   this case.  What happened here is they're taking down their

25   content, they're putting it up somewhere else under a different

H8i1hera

1    domain name with a different host and a different registrar.

2              THE COURT:  Okay.  So let me bring this to an end.  By

3    the way, thank you for all that.

4              What do you want to do?

5         MR. STRAMIELLO:  We would like to be, as a nonparty

6    who was dragged in here, for something that was mooted and was

7    mooted before the filing was made, we would ask for our

8    expenses and costs, and we will be happy to supply the Court

9    with a filing as to what they were, and we can bicker about the

10   number and everything else, but we would like to have that.

11             THE COURT:  Ms. McCabe?

12        MS. McCABE:  Your Honor, I think that's completely out

13   of line.  I spoke with Let's Encrypt's California counsel the

14   Friday before their papers were filed, and basically the

15   conversation was, tell me why you think Let's Encrypt is on the

16   hook.  And, you know, I tried to explain to them why I thought,

17   you know, they were on the hook to remove or revoke the

18   certificates.  And they said, well, it's too late.  It's too

19   bad.  And that was it.  They hung up the phone.  And the next

20   thing I knew, Monday they filed their papers.  After that, we

21   sent a letter, as I said, to the Court saying, we withdraw our

22   claims against Let's Encrypt because the sites are down and the

23   issue is moot, and instead of just saying, okay, this is over,

24   they filed more papers, and they came to court.  There was no

25   reason for them to come to court.  So they're actually

H8i1hera

1  increasing their own costs by coming here after we were told --

2  and we filed with the Court a clear letter that said we were no

3  longer going to pursue the claims against Let's Encrypt.  And,

4  your Honor, the order is very clear, and these kinds of orders

5  are issued in trademark cases all of the time.

6            I would just refer your Honor to another case, *ONE11*

7  *Imports, Inc. v. Nuop, LLC*, another Southern District case

8  decided December 19, 2016; and also *North Face Apparel Corp. v.*

9  *Fujian Sharing Import*.  And this case involved the public

10  interest registry, another nonprofit, and the court found them

11  to be liable for aiding and abetting.  And that's the question

12  under Rule 65, and that's where your Honor's March 8th order

13  comes into play.  And yes, if Enom had deregistered the name

14  and the domain name went away, we wouldn't have had to bother

15  Let's Encrypt, but Let's Encrypt was adding credibility to the

16  defendants, who are clearly serial infringers and bad actors,

17  by issuing them a certificate and giving unsophisticated

18  consumers the impression that this was a legitimate site.  And

19  that's where I think the tie-in to the aiding and abetting

20  comes into play.

21            THE COURT:  Okay.  So Mr. --

22            MS. McCABE:  And also, if I might add one more thing.

23  After we received -- we saw that Let's Encrypt was applying to

24  bring in a computer to the court because, oh, I guess they're

25  coming, you know, I wonder why, so Ms. Hall here, my colleague,

H8i1hera

1   called counsel several times, emailed him, and no response.

2   Absolutely no response.  So, you know, I don't see how they can

3   blame us because they appeared here today.

4             THE COURT:  So this is what I'm going to do.

5   Mr. Stramiello, if you want to make a motion for costs, you can

6   make the motion.

7             MR. STRAMIELLO:  Yes, sir.

8             THE COURT:  When will you get those papers in?

9             MR. STRAMIELLO:  When would you like them, your Honor?

10            THE COURT:  Two weeks?

11            MR. STRAMIELLO:  Sounds good, sir.

12            THE COURT:  Okay.  Two weeks to respond?

13            MR. STRAMIELLO:  Yes, your Honor.  We will let you

14   know whether we will make a motion or not, and we'll either

15   make the motion or decide to let it drop.  But we'll do it by

16   two weeks.

17            THE COURT:  Okay.  Very well.

18            Ms. McCabe, two weeks to respond?

19            MS. McCABE:  Yes, please.

20            THE COURT:  And one week to reply if you make the

21   motion.

22            MR. STRAMIELLO:  Yes, your Honor.  Thank you.

23            THE COURT:  Okay.  So you're free to stay, but we'll

24   move on to Ms. Singer.

25            MS. SINGER:  Yes, your Honor.  So I am here on behalf

H8i1hera

1    of nonparty Twitter, which was not named in the March 8th

2    order but was named in the July order to show cause papers.

3    It's Twitter's position that the March 8th order does not

4    identify with the requisite specificity to Twitter to act.  Any

5    content that is particularly infringing, it doesn't -- it sort

6    of nonspecifically says, don't infringe anymore, don't do

7    anything that's too similar.  And what plaintiffs did was send

8    a letter to Twitter that accompanied order and said, please

9    disable this account.  The account, the Twitter handle, is

10   HerbalAlchemis, no T.  The trademark that is listed in the

11   order is Herbalist & Alchemist.  And Twitter's position has

12   simply been, if you identify the specific content that you want

13   removed, we'll take down the content, but the letter that you

14   sent doesn't give us enough information to act on it.

15         THE COURT:  Why not?  Is it hashtag Herbalist

16   Alchemist?

17         MS. SINGER:  It's HerbalAlchemis.  It's not Herbalist

18   & Alchemist.  There's a lot of -- Twitter's policy is that user

19   names, or Twitter handles, are first come, first serve.

20   Because you can, in the real world, have people have the same

21   trademark and they're in different classes of goods, they're in

22   different countries, you know, you could have Delta Airlines

23   and Delta Faucets, you can have Columbia University and

24   Columbia Sportswear, and in the real world, and you can have

25   Colombia as a country with all kinds of other stuff there.  In

H8i1hera

the real world, you can have those various things.  But only

one person can have the Twitter handle Columbia or Delta or

whatever it is.  So Twitter has a first come, first serve

policy on user names.  And it's Twitter's position here that

the order doesn't say -- that HerbalAlchemis is different.

        We note that at the time the letter was sent, and I

think as we sit here today, nobody actually has -- there's

applications, there's a lot going on at the PTO, as I

understand it, but nobody has registered trademarks.  There

is -- actually, I think the only registered trademark that we

found that was close is actually some totally unrelated party.

There's an Herban Alchemist that has a registered trademark for

arranging and conducting educational conferences.

        But the issue is that Twitter is not in a position to

take a look and figure out who has more senior rights or who

has better rights or whether it specifically applies to this,

and if you have a party that is a rights owner that sends a

notice that says, here's what our trademark rights are, here is

the specific content that we believe infringes our rights,

Twitter will take down that content on the notice, but if you

just get a letter that says, there's infringement happening and

please act against this user's account, it's not specific

enough, because the district court in the *Tiffany* case --

there, Tiffany was actually sending eBay notices that said,

disable this particular user.  And the court was very clear

H8i1hera

1    that eBay's policy, which is that it does not automatically and

2    permanently suspend accounts based on one or two notices of

3    claim infringement because, their words, you know, there's all

4    kinds of consequences and various things and you really had to

5    balance it, so --

6         THE COURT:  Can I just stop you for a second.  As I

7    understand it, if I were the first one to go to Twitter -- I

8    don't have a Twitter account.  Sorry.  I don't know how it

9    works.  If I were the first one to go to Twitter and register

10   my name, my handle as XeroxCopier, I could do that, if I was

11   the first one.

12        MS. SINGER:  If you were, and then if a company that

13   had a registered trademark came in, there is a procedure by

14   which you can say, I have a registered trademark, here's my

15   registered trademark, and there's a different policy on user

16   names, but you can go through that process and there are

17   instances in which Twitter will remove the user name.  But

18   that's not what you have here.  You just have here somebody

19   saying, you know, this user name is too close to mine so take

20   it down, and that's not the same thing.  Without a registered

21   trademark --

22        THE COURT:  Okay.  And so what was it that you

23   received from the plaintiff and why was it that you could not

24   comply?

25        MS. SINGER:  What we received from the plaintiff was a

H8i1hera

1   letter that enclosed the default judgment and that said, please

2   disable this account, and there was not enough specificity in

3   the letter that said, here's the contents of the infringement.

4   There's a lot of different content on this account holder.  It

5   has posted lots and tweeted several hundred times.  Some of it,

6   it's offering supplements, some of it is saying, "I just

7   checked in at Starbucks."  It's all over the place.  The actual

8   account, the picture on the profile is -- I think the last time

9   I checked last night it was a picture of a safe handling

10  certificate on a package of corned beef, so it was the meat

11  handling instructions.  You know, they're offering supplements,

12  but there wasn't sufficient information in the letter to say

13  these supplements infringe my trademark.  You know, there

14  wasn't anything saying there's counterfeit.  There just

15  wasn't -- Twitter gets, as you can imagine, many, many

16  notifications, and Twitter just is not in a position to go

17  behind any of these or to search accounts and try to say, of

18  the hundreds and hundreds of tweets here, you know, maybe this

19  one, is this what you're concerned about?  I mean, so the way

20  it works is -- and there's, you know -- multiply that by

21  millions, hundreds of millions of Twitter users.  So the way

22  the process works is that you send a notice to Twitter and you

23  say, I have trademark rights in this mark, here is the specific

24  content that I claim infringes my mark, and Twitter will look

25  at it and Twitter will take it down.  And frankly, if you

1    report a certain number of times the same account, it will hit

2    Twitter's repeat infringer policy and the account will be

3    disabled.  But that's not what happened here.  We just got a

4    letter that said, here's a court order, take this down.

5           THE COURT:  And you couldn't respond, or you couldn't

6    comply because it wasn't sufficiently specific.

7           MS. SINGER:  Right.  There's no mention there of any

8    particular content, there's no mention of this particular

9    Twitter handle.  There just wasn't enough for Twitter to know

10   exactly what content it was being asked to act on.

11          THE COURT:  So what does Twitter do in that situation?

12          MS. SINGER:  Twitter sends back an automated response

13   that says, we can't act on the report that you filed.

14          THE COURT:  So I'll tell you what my understanding is

15   and you tell me if I'm wrong.  So you say that there's a

16   Twitter account that has a particular handle, some version of

17   Herbalist & Alchemist, and there's content on that account.

18          MS. SINGER:  Mm-hmm.

19          THE COURT:  And if you had received a specific request

20   concerning this particular user on Twitter, and that identified

21   specific content, you would have taken that content down.

22          MS. SINGER:  Yes.

23          THE COURT:  And I guess presumably there could be

24   other content that's not infringing, so that particular

25   Herbalist & Alchemist could have also put up vacation pictures,

H8i1hera

1   for example.

2           MS. SINGER:  Exactly.

3           THE COURT:  And that you would not have taken down.

4           MS. SINGER:  Right.

5           THE COURT:  So you have to be told, this tweet, this

6   tweet, this tweet.

7           MS. SINGER:  Exactly.

8           THE COURT:  Okay.  Ms. McCabe?

9           MS. McCABE:  Okay, your Honor.  I have a printout of

10  the accounts, and we can also bring it up on the computer.

11  Which would your Honor prefer?

12          THE COURT:  Sure.  Let's use it, see if it works.

13          MS. McCABE:  While we're doing that, I just wanted to

14  mention that we notified Twitter three times, not just once.

15  So we did a report on January 23rd, which was an account

16  pretending to be a represent -- like company brand or

17  organization.  We recorded a trademark issue after that.  And

18  then finally, on May 10th, we again went back and attached

19  your Honor's order and sent them a full-blown letter, and in

20  the letter are pictures of the product that you can see on the

21  Twitter account.  And we gave them the specific handle,

22  @HerbalAlchemis, and we also gave them the web page.  So I

23  don't know exactly what counsel is saying, but -- and then we

24  got a response back on June 8th finally that says:  "This

25  account is not in violation of our trademark policy.  As a

H8i1hera

1   result, we will not be taking action at this time."

2           So what I want to say, your Honor, is that Twitter has

3   invented its own trademark law, basically, because you do not

4   need a registered trademark to have trademark rights.  Our

5   whole complaint was based on 43(a) of the Lanham Act, which is

6   based on unregistered marks.  You do not have to have a

7   registered mark.  Our mark is in the process of being

8   registered.  Our client had a registered mark at one time.

9   Unfortunately, they failed to renew it.  But under New York

10  State law, New York State trademark law, you don't need a

11  registered mark to bring an action.  So why is it that the only

12  thing they were relying on is trademark registration when your

13  Honor, in your March 8th order, said there's trademark

14  infringement, under federal law, under state law, there's cyber

15  piracy, there's false advertising?  So I don't understand their

16  interpretation of -- and if you look at their policies, you

17  know, they do have trademark policies.  They're basically

18  violating their own policies.

19          And now I'd like to bring up the account, because the

20  account has approximately 377 posts.  Every one of those posts

21  says, herbal-alchemist.  You'll see it.  And then it says

22  @HerbalAlchemis without the T.  And I counted at least 40

23  pictures of our products, 50 percent off, and many of these

24  links have been disabled now, but at one time you could link in

25  and buy the product right from the Twitter page.  So I don't

H8i1hera

1    understand how this is not trademark infringement when here,

2    right here on the page, it says -- can you pull it up.  I'm

3    sorry.  At the top it says HerbalAlchemis.  And every tweet

4    says HerbalAlchemis.  So every tweet needs to be taken down.

5    And it's all about their infringing products.  They may have

6    added some junk recently about the corned beef stuff, I think

7    basically to throw people off the track.  But basically the

8    account has got the infringing product all over it and our

9    trademark all over it.  I don't know how that's not aiding and

10   abetting the defendants in selling the product and promoting

11   advertising, all of the things that were prohibited under the

12   March 8th order, and it's not necessary -- again, I go back

13   to the cases I cited before in the Southern District.  It's not

14   necessary to name nonparties.  We're not seeking to bring an

15   action for contributory trademark infringers or vicarious

16   trademark infringement.  All we're seeking to do is go under

17   Rule 65, where it says that you can't act in concert with the

18   defendants to do what is prohibited in the order.  And that's

19   what's being done here.

20              THE COURT:  Well, let me ask you, since then is this

21   account still up?

22              MS. McCABE:  Yes.

23              THE COURT:  Ms. Singer --

24              MS. McCABE:  If we could just scroll down, you can see

25   how many, you know -- their account goes back to June 2016.

H8i1hera

1    And the product is -- here we go.  You know, St. Patrick's Day.

2    And every time, you know, a posting like this goes up, my

3    client gets people calling them, oh, I want that special for

4    St. Patrick's Day.  My client said, what special for

5    St. Patrick's Day?  Or CBD oil, which is illegal in many

6    states.  It's made from cannabis.  They call my client, say, I

7    don't like --

8              THE COURT:  What are you doing with it?  We have that

9    on the record, right?

10             MS. McCABE:  Evidence.

11             So they're selling a product that's not supposed to be

12   sold.

13             THE COURT:  Well, let me ask a silly question.  If I

14   understand Ms. Singer, Twitter is happy to comply with a court

15   order that is sufficiently specific to allow them to act.  Have

16   you two talked about, well, what kind of order would you need,

17   Ms. Singer, to take this infringing account down?

18             MS. SINGER:  Well, to be clear, it's Twitter's

19   position that it has not acted in concert, it is not aiding and

20   abetting.  Twitter is a passive host.  And at the risk of

21   making a statement very much against interest, if there was a

22   claim against Twitter, it would have to be for some sort of

23   contributory infringement, which I don't think they have the

24   elements for that here.  So the conversations that we've had

25   is, we don't even need a court order, we just need you to tell

H8i1hera

us, identify, send us a notice that identifies what your

trademark rights are and what content you would like to have

down and we'll take it down.

          MS. McCABE:  We've sent them three notices, your

Honor, and we've issued papers, we've attached pictures.  I

don't know what else we can do.

          I just want to quote from the *Tiffany* case that

Ms. Singer mentioned.  It says, "When a service provider has

reason to suspect that users of its service are infringing a

protected mark, it may not shield itself from learning of the

particular infringing transactions by looking the other way."

          THE COURT:  Ms. Singer, is it your position that you

can't comply because this particular mark is not registered?

          MS. SINGER:  No, your Honor.  Twitter recognizes that

under US law that certainly you can have common law rights to a

trademark.

          THE COURT:  Sure.

          MS. SINGER:  I think that it is my understanding --

and I don't have the notices in front of me, they're not part

of the record -- that the earlier notices didn't provide

sufficient information that said, here's the basis of our

trademark rights.  I can't make that representation one way or

another because I haven't seen them.  They're not in the

record.  So if Ms. McCabe has more information on that.  But

the point was never that they don't have trademark rights.  The

H8i1hera

| 1 | point was, you have to give us, you have to identify content |

1     point was, you have to give us, you have to identify content

2     and that you can't just -- it is not proper under the

3     contributory trademark law to say, take down the user's

4     account.  It's to report particular content.

5             And the *Tiffany* case, which, with all due respect, I

6     litigated, the district court was very clear that, because

7     there were a number of instances where Tiffany was sending

8     notices to eBay that said, you know, here's notice, here's

9     content on this particular user's account, take down this

10    content, disable this account, and eBay would take down the

11    content but they wouldn't disable the account, and the district

12    court said -- and it wasn't an issue on appeal so it's not part

13    of the Second Circuit decision, but the district court was very

14    clear that that was an appropriate policy.

15            So I think we've got two -- I think the issue that we

16    have here is that Twitter's position is, if you send us a

17    notice that identifies particular content with enough

18    specificity that we can find it -- and the statute, the law

19    talks about reasonable specificity -- we'll take down that

20    particular content.  If there was a court order that said the

21    name HerbalAlchemis, which is not the same thing as Herbalist &

22    Alchemist, which is the mark at issue, if there was an order

23    that said this particular HerbalAlchemis with no T is

24    infringing, then that might provide Twitter with the

25    specificity that it could act, but, you know, they're two

H8i1hera

English words here, and so I understand that there's a dispute,
but to ask Twitter to take it down without it being in the
order puts Twitter in the position of -- there's lots of --
everybody's got trademark obligations here.  So basically
Twitter's in the position of having to mediate between third
parties, and that's just not a position that it wants to be in,
that it can be in.

THE COURT:  Okay.  So for example, today, Ms. McCabe
can send you a letter saying, with respect to this particular
account, each of the 140 or however many tweets in the
particular account are infringing, please take them down, and
you would respond affirmatively to that, a request of that
type.

MS. SINGER:  If she sends a letter that listed out the
specific ones and why, then it's my understanding, yes.  We
asked for that letter earlier this week so we didn't have to be
here, but here we are.

MS. McCABE:  May I respond, your Honor?

THE COURT:  Sure.

MS. McCABE:  So I just want to say, attached to my
declaration that was submitted with our original motion for
contempt, Exhibit N has two of the notices that we sent, so
that they are in the record.  There may be one that was not in
there, but at least two of them are in the record.  And I just
don't understand why my client has to go through the expense of

H8i1hera

1    listing 377 tweets that have to be removed.

2              THE COURT:  How much does that cost?

3              MS. McCABE:  We'll have to take a picture of all of

4    them and then they want us to submit it through their website.

5    We can't just send a letter.  And the handle is infringing.  I

6    mean, you know, Ms. Singer did represent that she would take

7    down the tweets themselves.  But then the handle is still

8    there, so he could use it again.  And, you know,

9    substantially --

10             THE COURT:  But my understanding -- well, go ahead.

11             MS. McCABE:  And under trademark law, it's pretty well

12   known that is there a likelihood of confusion between

13   HerbalAlchemis without the T and Herbalist & Alchemist.  Your

14   Honor, I've been practicing for over 20 years in trademark law.

15   I have never seen a case with more confusion than I've seen in

16   this case.  My client has gotten dozens and dozens of calls and

17   emails where clients, her customers, think that these guys are

18   them, and they're not.  And it's hurting their reputation, it's

19   hurting their bottom line, and I don't know how it can be

20   argued that HerbalAlchemis without a T is not confusingly

21   similar to Herbalist & Alchemist.  And we did submit in our

22   original papers some of the instances of confusion, but I'm

23   happy to give them all to your Honor.

24             THE COURT:  No.  But as I take Ms. Singer's argument,

25   it may be confusingly similar, it may not, but don't get me in

H8i1hera

the middle of this, give me precisely what I need and I'll do

what I have to do.  And it seems to me that it shouldn't be a

huge burden on your client.

MS. McCABE:  We're happy to list all the tweets, but

then what happens with the handle, the @HerbalAlchemis?

THE COURT:  Well, again, I'm an old-fashioned guy, but

I would call up Ms. Singer and say, look, I want this handle

taken down, what do you need from me in order to do this?

MS. McCABE:  We've had that conversation several

times, and she told me she can't take the handle down.  That's

why we're --

THE COURT:  Is she right?

MS. McCABE:  I disagree with her in terms of trademark

law.  No.  It's a confusingly similar issue.  And if this was

all about something else, maybe I could see her point, but the

only thing this -- all these pages talk about is our product,

is their product, their infringing product.  40 pictures that I

counted of the product.  That's commercial use.  If I submitted

this, if I wanted to register @HerbalAlchemis with the

trademark office and I have to prove interstate commerce, use

in interstate commerce for the trademark, they would take this

in a minute.  This is commercial use of a trademark, despite

what, you know, Twitter says its policies are and everything

else.  They can't, you know, say, I'm above the law, you know,

trademark law doesn't apply to me.

H8i1hera

1          THE COURT:  Ms. Singer?

2          MS. SINGER:  So --

3          THE COURT:  Help me out here.

4          MS. SINGER:  So the issue -- a couple of things.  I

5     think, first of all, there's several different -- I mean, you

6     have two words here.  You have several people who are claiming

7     that they have rights to this.  And Twitter's position is,

8     look, whoever's got rights to this, that's fine, but you can't

9     just kind of come in here and say, in my opinion, this

10    infringes, and expect Twitter to act.  What we don't have here

11    is an order that says -- we have an order that says they have

12    trademark rights in Herbalist & Alchemist.

13          THE COURT:  Right.

14          MS. SINGER:  But what you have here is something

15    different.  You have HerbalAlchemis.  And I understand that it

16    is Ms. McCabe's position and her client's position that these

17    are confusingly similar.  Maybe she's right, maybe she's not.

18    But Twitter shouldn't have to be in the position of making that

19    determination, because you also have on the other hand, whoever

20    this account holder is, claiming that they have rights in this.

21    And as I said, Twitter will do whatever it needs to do.  It

22    just needs to be shown, it needs some comfort that somebody has

23    the rights; otherwise, Twitter gets ripsawed between --

24          THE COURT:  Right.  So from your perspective, you

25    could receive a letter, an informal letter, which is to say not

H8i1hera

```
 1    an order from me, saying, please take down these tweets because
 2    a court has made a determination, a preliminary determination
 3    that these products infringe, and you would comply with that
 4    letter.
 5              MS. SINGER:  Maybe not informally.  It would have to
 6    say, you know, I'm authorized, you know, I am the trademark
 7    owner and I'm authorized to act on behalf of the trademark
 8    owner, you know, here's the basis for my trademark rights
 9    and --
10              THE COURT:  By informal, I just meant not a court
11    order.
12              MS. SINGER:  Yes, yes.  If we received a notice,
13    whether it was a letter, whether it was through the website,
14    however, you know, they report it, that has all of the
15    requisite elements and shows that they have rights and reports
16    the specific content that they claim is infringing and what the
17    basis is for that contention, then Twitter will act on that
18    notice.
19              THE COURT:  And then with respect to the actual handle
20    and the actual account, if you were to get a court order from
21    me that says, I have made a preliminary determination that this
22    handle is confusingly similar to that of plaintiff in this case
23    and I direct you to take it down, what would you do?
24              MS. SINGER:  I would have to consult my client, but
25    obviously if there was a court order that had that level of
```

H8i1hera

1    specificity, you know, from the Southern District of New York,

2    that is certainly something that I would advise my client to

3    act on.

4              THE COURT:  Okay.

5              MS. McCABE:  If I could just read from Twitter rules.

6    It says, "We reserve the right to reclaim user names on behalf

7    of businesses or individuals that hold legal claim or trademark

8    on those user names.  Accounts using business names and/or

9    logos to mislead others may be permanently suspended."  So it

10   is within their scope to remove a user name or a handle,

11   whatever you want to call it.  And if we can get the handle

12   taken down, and the content goes away and it doesn't get put

13   back up, we're done.  That's all my client wants.  They don't

14   want to drag in all these nonparties; they just want all this

15   stuff that's hurting them to be take taken down.

16             THE COURT:  But the point of my last several questions

17   to Ms. Singer was that there is a path for doing this.  So why

18   don't we take that path --

19             MS. McCABE:  Okay.

20             THE COURT:  -- and, you know, prevent my involvement

21   to the extent possible.  I'm happy to sign an order along the

22   lines that I've described.  I assume that you can make a

23   showing that would support such an order.

24             MS. McCABE:  Yes, your Honor.

25             THE COURT:  So --

H8i1hera

         MS. McCABE:  I would argue that your March 8th order

already says there's trademark infringement, that we have a

legitimate right, and, you know, when the other side didn't

show up, they lose their right to say, we have a legitimate

trademark.  And let's not make any mistake; this Twitter handle

is owned by the defendants, okay?  If it was owned by somebody

else, I could see the argument.  But it's owned by the guys

that your Honor has already said are infringing, are guilty of

cyber piracy and have yet to appear once in this courtroom.

         THE COURT:  And we can litigate that or we can resolve

it in the way that I've suggested.  I'm happy to do either.

Because I'll be here no matter what.  But there appears to be a

way to get this done with as little pain as possible to all of

your clients.

         MS. McCABE:  In that regard, your Honor, we drafted a

proposed order which includes that issue of the handle on

Twitter.  It also includes the agreement we reached with

YouTube about taking down certain videos, and then it covers

the defendants and the other parties that haven't appeared.  So

I'd be happy to pass copies around, if that's helpful.

         THE COURT:  Have you discussed that proposed order

with Ms. Singer?

         MS. SINGER:  No, your Honor.

         MS. McCABE:  No.  Because she said no.  We asked her,

will you take the handle down, and she said no, but we put it

H8i1hera

1   in a proposed order.

2           THE COURT:  Well, that's two different issues.  So why

3   don't we do this.  Why don't you folks talk and talk about what

4   language would be sufficient, satisfactory to Twitter, and then

5   submit something on consent.  I think that's probably the best

6   way to do this.  Any objection to that, Ms. Singer?

7           MS. SINGER:  No.  We can certainly -- I mean, it's

8   Twitter's position that that order -- we can discuss, I haven't

9   seen it -- that it should be clear that there was no contempt,

10  that Twitter was not aiding and abetting and there's no

11  liability or contempt for Twitter based on the March order,

12  which was insufficiently specific to bind Twitter, in Twitter's

13  opinion.

14          MS. McCABE:  We're not asking for contempt, your

15  Honor.

16          THE COURT:  Okay.  So there should be no problem in

17  coming to some sort of agreement on language.

18          MS. SINGER:  Thank you, your Honor.

19          THE COURT:  Okay?  Are we good?

20          MS. McCABE:  Yes.

21          THE COURT:  Okay.  So we're adjourned.  And obviously

22  any party is free to come back to me if there is any holdup, if

23  there's any obstacle to reaching agreement.  Okay?

24          MS. McCABE:  May I ask one more question, your Honor?

25          THE COURT:  Absolutely.

H8i1hera

1              MS. McCABE:  In terms of the defendants and the

2      parties that are still infringing and have not appeared, will

3      we just submit a proposed order and your Honor will --

4              THE COURT:  Yes.

5              MS. McCABE:  -- go forward with that?

6              THE COURT:  Yes.

7              MS. McCABE:  Okay.  Thank you very much.

8              THE COURT:  Okay, folks.  Thank you very much.

9              ALL COUNSEL:  Thank you, your Honor.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25